CLAY ROBINS, APPELLANT AT THE DISTRICT COURT CLAY ROBINS, APPELLANT AT THE DISTRICT COURT Please, Your Honor. I am Clay Robins on behalf of the appellant. I would like to reserve two minutes. In the briefs that have been submitted to the Court, the parties have outlined several cases that have come down since the opinion of the District Court here. Those cases have included, and we have discussed, Hussain, Rodriguez, and Blansett. You were on Rodriguez, right? Were you on Rodriguez? Yes, I was the appellant in Rodriguez. We've discussed those. But since the briefing has been completed, there has also been an opinion from the law lords in England on the DVT and air travel group litigation. That opinion takes into consideration a specimen matrix, which we do not have there. That specimen matrix does not have before it facts indicating a policy or a practice or a procedure to provide warnings to the air traveling public. What we have here, and to the extent that that is now an issue, as we apparently have to deal with since Rodriguez and Blansett, what we have here, though, is a different situation. This flight took place long after the flights in the DVT group litigation. This flight took place in May 2002. And at that time, we do know that IATA had issued instructions to its members, Continental being one of them, that their passengers should receive a warning concerning DVT. That was not done by Continental until December of 2003, if memory serves me correctly. Well, let me ask you this. Do you read the record in this case as stating that the passengers developing DVT during the course of international air travel is well recognized? That was not discussed in the stipulation, Your Honor. Well, was it disputed? I mean, I think that a reading of the record can say that it wasn't disputed. Well, certainly there was nothing presented by Continental to suggest that they did not know. And as a matter of fact, the evidence that we presented by way of our declarations, albeit beyond the stipulation, shows clearly that that information was out, available and known to Continental. In fact, Continental's own medical director is a member of the Aerospace Advisory Committee that itself in 86 and then again in 96 made recommendations that their member airlines give passengers information concerning DVT. So we have a history of Continental knowing about DVT, about what causes DVT on these long-distance air flights, and yet doing nothing, notwithstanding the fact that its own medical association and IATA, its own International Air Transportation Association, had given recommendations that folks be given information that they could use. Well, tell me this. I know this is rather simplistic, but all right, Rodriguez is out there. That's sort of the, you know, the alligator in the bathtub for you. And why isn't our decision in Rodriguez dispositive here, meaning that if you take the holding of Rodriguez that it can't, it's not an accident, how then can you create this other, if that's the big circle, then a smaller circle inside of it then suddenly can be actionable under Warsaw? Your Honor, I did not then, nor do I now, agree that airlines should be allowed to determine their liability under the Warsaw Act, that is, leading it up to airlines to create their standards, practices, et cetera. I would agree that standards and practices may inform what a passenger might consider to be unusual or unexpected, but that is not the sine qua non I would suggest to liability. Nobody, or at least the Ninth Circuit in Rodriguez, that panel in Rodriguez and Blancet, don't follow that direction. They take the direction that if there is, or at least Rodriguez did, if there is evidence of a violation of a policy or a practice, then that may form the basis, or at least Rodriguez suggested that may form the basis of a finding of an accident. That is what we have here by virtue of the fact of the evidence that was presented and also the discussion of the evidence in Blancet itself acknowledges that there was a standard at that time to provide a warning. That is the difference between this case and Rodriguez. I don't agree with, obviously, the holding in Rodriguez because I think it's a very, very dangerous precedent. However, to the extent that Rodriguez left open to put that into the airlines, why is that now becoming a dangerous precedent? I truly believe that leaving it up to the airlines to determine when they have information about a danger presented to their passengers, to make the decision on their own whether or not they will adopt a practice to inform, and then allow that decision to determine whether or not there will be an accident under the Warsaw Act, is dangerous because the airlines, as they did, I contend, in Rodriguez, had the information, decided not to adopt a practice. And by virtue of that decision, they were able to make the decision, they absolved themselves from liability under the Warsaw Act. That, Your Honor, is a dangerous, dangerous precedent. And I so argued to the panel in Rodriguez, and I will continue to support it. But is the development of DVT on long-range international flights something that's unusual or unexpected? I believe that the failure to give a warning when the airlines have this information is unusual and unexpected. And that must be judged from the standpoint of the passenger. So from the standpoint of the passenger. Where do we draw the line? I'm just, you know, I'll just make the parade of horribles from the other side. If, you know, anytime you create a duty to warn, then what do you have to warn about? Then does everyone have to take, and obviously the individual knows a lot more about their health than an air carrier. So does everyone have to take a medical exam before they get, you know, on a flight to decide if they can fly? I mean, you know, that's sort of the parade of horribles of where you're going. And certainly that is up to the passenger. The passenger may make the decision based upon the information provided from the carrier, which is information that the carrier has, not the passenger. The passenger, once informed, may make the decision what to do. It may be he or she may decide to drink, regardless of whether they are thirsty or not, and certainly drink water as opposed to tea or alcohol. May decide to move their feet around, which is what studies now show is all that's really required to give you some protection from DVT. But it's the passengers that need to know that there are certain individuals that are acutely at risk. Those who are aged. Those women. Women taking the pill. Individuals who have had reconstructive surgery on their limbs. Should there also be warnings, then, for not clearing your ears due to a change in air pressure? No. That may cause the eardrum to burst at some point in time? I would suggest no, because there is no studies to show that a significant portion of the traveling public would receive injury from the normal changes in cabin pressure. That's obviously what we're dealing with in Sachs. Is there a number that you would look at that you would say to be able to quantify what portion of the traveling public would be required to have this condition or potentially contract it in order to require that there be a warning given by the airlines? I don't think that there's a bright line that one can give. However, when we are dealing with hundreds of thousands of individuals making transoceanic trips each year, and where studies are showing a 10 percent probability of those individuals developing DVT as a result of cabin conditions, I believe that that is a significant enough hazard to at least provide a basis for the airlines to give the warning. And airlines are now giving the warning. So if they are not giving the warning, the question then becomes, are they doing a moot act? Is there no reason for them to give the warning? And the answer to that would be, well, no, there is a reason, and people need to know. And it's a simple measure that can be taken by airlines to inform the public. Do you want to save the rest of your time? If I may, please. Thank you. May it please the Court, Bill Boyce, on behalf of Continental Airlines. I notice that you have another name here. Are you going to make — you only have 10 minutes total, so. I'm the sole spokesperson today. Okay. Because I don't want the other person to jump up and say, well, now I want my 10. Okay? No, Your Honor. I'm it. All right. The district court's grant of summary judgment is correct, and it should be affirmed for two main reasons. The first is, as the Court has already zeroed in on, the Rodriguez decision, and I did not hear any effort by plaintiff's counsel to distinguish Rodriguez. I heard disagreement with the holding of Rodriguez, but I heard no effort to distinguish it. And I think when the Court examines the record in this case, what this Court is going to find is that the records here are very nearly identical. If the Court looks at the excerpts of record in this case at pages 265 through 353 and compares them to the Rodriguez excerpts at page 496 through 626, what the Court is going to find is that the exact same materials in the exact same order were tendered to the Rodriguez court and tendered — are now tendered to this court as a basis for these contentions about what should be done. They were found to be insufficient and not germane to the accident inquiry in Rodriguez, and the same conclusion applies here. MS. GOTTLIEB I have a question about the industry standard. Should we focus on the industry standard for determining liability under the Warsaw Convention? MR. GARRETT I have two answers to your question, Your Honor. The first is this. For the narrow question in this case, should the district court summary judgment be affirmed, I think that everything this Court needs to affirm is set forth in Rodriguez and in this case, as in Rodriguez, there is no basis to even get to where the plaintiff can say that an industry standard was violated. So just as in Rodriguez, this case should be affirmed. That's the first answer. The second answer is this. As set forth in our briefing, I think there is room for discussion about whether industry standards can trump a Federal regulatory scheme and regulations with respect to warnings. That's the blanset question from the Fifth Circuit decision. MS. GOTTLIEB I'm just wondering if courts were to focus on industry standard as a basis for liability, you know, wouldn't we be encouraging air carriers to establish lower standards to avoid liability then? MR. GARRETT I believe that there are problems with focusing on purported industry standards as the measure of an accident. I'm not sure that that is a question that this particular panel needs to confront in this case in order to affirm. But putting that aside for a moment, I think that there are issues and concerns because the industry standard discussion really does not take into account a comprehensive Federal regulatory scheme with very, very detailed requirements about what can be said for in-flight safety announcements. I think this is the discussion that the blanset undertakes. And I do want  MS. GOTTLIEB Well, is there, if we're talking about from the standpoint, I mean, essentially you're saying that Rodriguez is dispositive of this particular case. But the facts, there are some facts that are a little bit different here. Is there, you know, if we're discussing from, do you see anything different here that makes this case worthy of publication that it's, or are you just saying Rodriguez answers all the questions and that's the end  MR. GARRETT I'm saying first, Rodriguez answers it and that should be the end of the inquiry. If the Court has a belief that there are some differences that warrant further discussion, we certainly believe that the, and there's a desire or a belief that the Court needs to go beyond just the industry standard issue and talk about the FAA regulations, then we certainly endorse blanset and say that it should be followed. But I do want to zero in on, to the extent that there are any purported differences here in these cases. Because if you boil it right down, to the extent that there is a difference in the factual basis or contention, I think it comes down to the report, the Feral Con report that has been included in the Cayman record here that was not in the Rodriguez record. That appears at pages 186 through 194 of the record excerpts. But I think that report is very, very telling because what the Court will see is that throughout that report, the contention is that Continental acted negligently. And all of this discussion that has been put forth in the plaintiff's opening, all, I think the primary focus of the plaintiff's discussion in their briefing is that Continental has acted negligently. We certainly don't concede that, don't agree with that, but the point is this. Cayman pled this case contending that an accident had occurred because Continental acted negligently. That appears at page 3 of the record excerpts. If you look at the Con report, it repeatedly makes reference that there was a new or should-have-known kind of analysis, and therefore, there was negligence. If anything is clear by this point in the progression of these accident cases, it is that negligence is not the measure of an accident. And an argument that tries to frame the accident analysis in terms of new or should-have-known or negligence is misconstruing the standard. And I think that Rodriguez makes that clear. Blancet makes that clear. Hussain makes that clear. Going all the way back to the facts. And counsel, in Hussain, which is what I was trying, what we're going to get to, do you find that there's any issues that Hussain may cause for the position that you've taken here in this case? No, sir. With respect to the industry standards? No, sir. I believe that Hussain is distinguishable from the circumstances here for exactly the same reason that the Rodriguez court said it was distinguishable, a circumstance involving an inappropriate response to an in-flight medical emergency is a distinguishable circumstance, particularly here when there is a stipulation. And I do want to hasten to add that all of this discussion with respect to industry standard is outside the stipulation that was the predicate for the summary judgment to begin with. So there's a question, is it even appropriate to go beyond that stipulation? But if we do go beyond that stipulation, we come back to the point that Hussain is distinguishable because Mr. Kamen stipulated that he made no request for assistance, didn't notify anybody during the flight. You're exactly in the same place that Rodriguez was. And I do want to emphasize this as well because we're not talking solely about Rodriguez as the basis for affirmance here, but also as counsel alluded to, the subsequent of 2005 from the House of Lords in England, both definitively rejecting DVT claims like those asserted here. And I think it's significant to tie it into your question, Judge Englund. Those courts found no conflict, no problem with Hussain. Why? Because Hussain involved distinguishable circumstances. In addition, the high courts of Australia and the House of Lords in England based their analysis in part on what Hussain said and what this court did in Rodriguez and what the Fifth Circuit did in Blanson. And so what we see is an international consensus forming that claims predicated on an alleged negligent failure to warn with respect to DVT simply are not actionable or viable as accidents under the Warsaw Convention. All right. Well, they obviously went to the international law to resolve their cases to do we need to do that to resolve ours? I think this case can be resolved under the four corners of Rodriguez. That's one answer. But a second answer is this. As this court, as the Ninth Circuit has pointed out in the Hosaka v. United decision and the Kerry v. United decision, both of which are discussed in the briefs, it is appropriate in the context of a treaty like this one to reference what the courts of sister signatories are saying and how they're interpreting this particular treaty. And when you have an international uniform consensus, as reflected in POVI, as reflected in NRA DVT, that these claims are not actionable, at some point the scale starts piling up to the point where it can't be overcome. You've got POVI, NRA DVT from the high courts of Australia and England, respectively. We've got Rodriguez from this circuit, Blancet from the Fifth Circuit. Of course, on the other hand, if the international cases went the other way, you would tell us not to look at them, right? Well, that would be a hypothetical question that is not presented on our circumstances here. Bottom line is this. Going all the way back to Sachs, the Supreme Court in Sachs has reaffirmed, has said, we need to look at what the sister signatories are doing. And I think that's powerful confirmation. One point I also want to stress about Hussein, there was some contention in here that somehow footnote 9 of Hussein has rejected the international cases. I don't think that's an accurate reading of footnote 9. It distinguishes the international cases. The facts in Hussein, as the Supreme Court itself recognized, were different. On that basis, the majority opinion distinguished the NRA DVT cases. I would also point out that in footnote 9 of Hussein, the court mentioned that those were intermediate decisions at that time. Hussein came out in 2004. Now these decisions have come out in 2005. Bottom line is this. The courts that have examined this issue have uniformly said these claims are not actionable. It's not negligence. It is not an accident. Accident is not negligence, and the allegations here, even if you assume a duty to warrant, even if you assume that these are somehow negligence, these still do not constitute actionable claims for an accident under the Warsaw Convention. And for all of these reasons, the district court summary judgment should be affirmed. Thank you, counsel. Please, the Court. Justice Scalia, in Hussein's opinion, was of the state of mind that the majority opinion most definitely was diametrically opposed to the foreign opinions, and so stated quite clearly. The foreign opinions themselves have taken issue with the majority opinion in Hussein and side with the Scalia defense. So to suggest that Hussein, that footnote number 9 cannot be read as being inconsistent with the foreign opinions, I think, is taking a bit of a myopic approach to an interpretation of what really has been said. The difference between Hussein and this case boils down to simply this. Mr. Kaman could not make a request of the airline because Mr. Kaman was not given the information from the airline upon which to make that request. And that's really where the difference boils down to. It's not simply a question of whether or not there is a medical emergency on board. The question is, how does the carrier respond to information that is in its possession, whether that information comes from a passenger on board, whether that information comes from studies in boardrooms and decisions made in boardrooms that affect the operations of the airline? So it's the response to information that is the accident here. And that is how Hussein and the DVT litigations, I think, would comport with one another, because here we are dealing with response to that. So once again, inaction now becomes the accident. Is that correct? A failure to act upon information in the carrier's position, possession, is the accident, yes, that causes the DVT in the patient, in the passenger, because the passenger was not able to do those things that he could have done in flight to have avoided that risk. Even though Rodriguez says that DVT isn't an accident. Rodriguez says that had there been evidence of an industry standard, they may have taken a different approach. That is what we have here. Now, this case was decided before Rodriguez. So if I am going to be restricted to a stipulation that was entered into simply to frame for the Court the question of whether or not a failure to warn can be an accident, then I would ask that this Court remand this case back for further evaluation of a factual basis to see what the standard truly was. We have presented what would be shown if this Court was to remand this case in the And the con declaration is significant because of that which it attaches as exhibits to his declaration, and that is the Aerospace Medical Association recommendations and also the reference to the IATA directive in 2001. The Court has in the Blateau file the actual content of that IATA directive in 2001. I did not have that at the time the Kaman case was presented to the to this Court in Brazil. All right. You have exceeded your time, so that will conclude argument. Thank you, both counsel, for your argument, and this matter will now stand submitted.
judges: B. Fletcher, Callahan, England